THE BOARD OF WATER COMMISSIONERS OF THE CITY OF
HARTFORD *vs.* ALLISON MANCHESTER.

THE BOARD OF WATER COMMISSIONERS OF THE CITY OF
HARTFORD *vs.* WILLIAM G. RICHARDS ET AL.

THE BOARD OF WATER COMMISSIONERS OF THE CITY OF
HARTFORD *vs.* ALLISON MANCHESTER ET AL.

THE BOARD OF WATER COMMISSIONERS OF THE CITY OF
HARTFORD *vs.* EMMA MANCHESTER ET AL.

THE BOARD OF WATER COMMISSIONERS OF THE CITY OF
HARTFORD *vs.* MARY C. RICHARDS ET AL.

First Judicial District, Hartford, March Term, 1913.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

In this State the "public use," for which alone the General Assembly
can constitutionally authorize private property to be taken, means
common utility or advantage, or what is productive of general
benefit to the community.

The condemnation of such property for the purpose of building a dam
and reservoir to impound the flood or freshet flow of a stream and
its return to the stream in times of low water, thereby maintaining,
so far as possible, the uniform, normal flow of the stream,—is a
taking for a "public use" within the meaning of that expression
in § 11 of the First Article of the Constitution of this State, since
the end sought is obviously for the benefit and advantage not only
of all lower riparian proprietors, but of all municipalities which are
or may be dependent upon the stream for carrying off sewage, for
operating municipal lighting plants, for providing water for public
baths and parks, or for other public necessities.

Having authorized the city of Hartford, through its board of water
commissioners, to take the water of the west branch of the Farming-
ton River for the purpose of improving and increasing the city's
water-supply, the General Assembly in the same Act (16 Special
Laws, p. 389) empowered it to build a dam and reservoir on the
east branch of the same river for storing the freshet or surplus
water of that branch and the return of the water so stored to the

stream in time of low water, and thus to make good, in whole or in part, for the water diverted from the west branch to the city; and also to condemn such land or other property as might be necessary or convenient for such reservoirs and for carrying out the purposes of the Act. Upon the application for the appointment of appraisers to estimate and report to the court the amount of damages which should be paid to the owners of land required to be taken for the so-called compensating reservoir and dam on the east branch, it was *held:*—

1. That in asking for the appointment of appraisers the application followed the language of the Act and was sufficient in point of form.

2. That authority to condemn land necessary to build this reservoir was clearly and specifically granted by the terms of the Act.

3. That while it was true the Act did not compel, but merely empowered, the plaintiff to build and maintain the compensating reservoir, yet the plaintiff's acceptance of the Act and its determination to take private property for such reservoir did impose upon it the legal obligation to return the water so stored to the Farmington River, in lieu of the water elsewhere diverted for the use of the city; and that any assignee of the plaintiff would necessarily assume all its obligations in this respect.

4. That the real, and declared, purpose of the east-branch reservoir was to restore the flow of the Farmington River to its former efficiency, and not to enable the plaintiff to trade off the impounded water in reduction of the money damages to lower riparian owners for water diverted from the west branch; and that the fact that the plaintiff was authorized to make such use of the water returned to the stream, if it could by agreement do so, was merely incidental to the main and primary purpose, and was not a valid objection to the exercise of the right of eminent domain.

5. That the taking of private property for the accomplishment of this purpose—which was clearly in the interest of the lower riparian owners on the Farmington River and of several populous manufacturing towns and villages along its banks—was a taking for a "public use."

6. That it was for the General Assembly to determine whether the building of the compensating reservoir might not be a proper and logical factor in a plan for supplying a municipality with water, and that its affirmative determination, if not controlling, was at least entitled to be received with great respect by the courts.

Argued March 5th—decided July 25th, 1913.

PETITION for the appointment of appraisers to estimate the amount of compensation which the defendant landowner should receive for the taking of his land for

reservoir purposes, brought to and heard by the *Hon. William S. Case,* a judge of the Superior Court, who sustained a demurrer to, and dismissed, the petition, from which judgment the plaintiff appealed. *Error and judgment reversed.*

By stipulation of the parties four other cases—*Board of Water Commissioners* v. *William G. Richards et al., Same* v. *Allison Manchester et al., Same* v. *Emma Manchester et al.,* and *Same* v. *Mary C. Richards et al.*—identical in all material respects with the present case, were argued with it. *Error and judgment reversed in each case.*

*William Waldo Hyde* and *Edward M. Day,* for the appellant (plaintiff).

*Edward D. Robbins* and *Birdsey E. Case,* with whom was *Andrew J. Broughel,* for the appellee (defendant).

BEACH, J. For all the purposes of these appeals the petitioner is a department or agency of the municipal government of the city of Hartford. *West Hartford* v. *Water Commissioners,* 68 Conn. 323, 331, 36 Atl. 786.

The Resolution in question (16 Special Laws, p. 389) comprises thirteen separately numbered sections, of which §§ 1, 4, 7, and 8 are material to this discussion, and are printed in a foot-note.* Section 1 authorizes

---

* Section 1. That the board of water commissioners of the city of Hartford, for the purpose of improving and increasing the water supply of said city, is hereby authorized, in behalf of said city, to take and hold the stream known as the Nepaug river, entering the Farmington river at a point one mile, more or less, above the village of Collinsville, in the town of Canton, at some point above where it enters the Farmington river, and also the stream known as Phelps brook, entering the Farmington river at a point one mile, more or less, below said Collinsville, at some point above where it enters the Farmington river, together with all streams and water sources connected with and feeding said Nepaug

the petitioner to construct reservoirs on Nepaug River and Phelps Brook, tributaries of Farmington River, and to divert water therefrom for the uses of the city of Hartford. Section 4 further authorizes the petitioner to build on another watershed, a dam and reservoir on the East Branch of the Farmington River, for the purpose of storing freshet water and returning it to the Farmington River "in lieu of waters of said

river and Phelps brook above the points of taking, respectively, excepting therefrom, however, the waters of Little brook, so called, in the town of New Hartford, or its watershed as already appropriated by the Collinsville Water Company. Said board of water commissioners is further empowered to take and to hold any lands or property, rights of way, easements, or other rights, whether owned by individuals or by corporations, either public or private, which said board may deem necessary or convenient for constructing aqueducts, reservoirs, and other works for the purpose of storing and utilizing such water supply, and for laying pipes and mains for conveying the same from said reservoirs to the city of Hartford, and for protecting the purity of said waters, and which may be necessary or convenient for the purposes of carrying out the provisions of this resolution.

Sec. 4. Said board of water commissioners is hereby further authorized to build, on the East Branch of the Farmington river, which enters the Farmington river at a point four and one-half miles, more or less, above said Collinsville, a dam at a point on said East Branch of the Farmington river, in the vicinity of the iron bridge over said East Branch near 'Richard's Corner,' so called, in the town of New Hartford, with all necessary spill-ways, locks, gates, and appliances for regulating the discharge and flow of water, according to the plans for the construction of said dam which have been prepared by said board of water commissioners, which dam shall be not more than seventy feet high above the bed of said East Branch at the point where the same is built, and there to construct a reservoir for storing and ponding the waters of said East Branch of the Farmington river, at times of excess flow in the Farmington river, with authority to use said water so stored for the purpose of returning, to said Farmington river, water in lieu of waters of said Nepaug river and Phelps brook diverted from said Farmington river as hereinbefore provided, and to make and enter into contracts and agreements with any person or corporation affected by any such diversion, providing that said water so stored, ponded, and returned to said Farmington river from said reservoir on said East Branch of the Farmington river shall be in lieu, in full or in part, of damages resulting to such person or corporation by reason of such diversion, and to make

Nepaug river and Phelps brook diverted from said Farmington river as hereinbefore provided." Sections 7 and 8 prescribe the methods and procedure by which the petitioner may acquire land and other property necessary to carry out the purposes of the Resolution.

The entire plan exhibited by the Resolution is to give to the city of Hartford the right to divert water from the Nepaug River and Phelps Brook, and to couple that

any and all such contracts, agreements, and conveyances as may be necessary or convenient to provide for the ownership, maintenance, care, and control of said reservoir on said East Branch of the Farmington river; and all contracts heretofore made by said board of water commissioners in connection therewith are hereby ratified and confirmed.

Sec. 7. Said board of water commissioners shall have power to make any contract of purchase for acquiring title to any land, water right, franchise, or other property required for or affected by such reservoirs, and for acquiring title, in the respective towns, to rights of way for such highways.

Sec. 8. If said board of water commissioners cannot agree with any owner upon the amount to be paid him for any land or other property to be taken for such reservoirs or for such new highways, or *as to the* amount of damages which ought to be awarded to any party claiming to be injured by the doings of said commissioners hereunder, said board may prefer its petition to the superior court for the county wherein such property so to be taken or damaged is located, or, if such court be not in session, to any judge thereof, praying that such compensation may be determined. Such court or, if such court be not in session, any judge thereof, may thereupon cause such notice of said petition to be given as such court or judge shall prescribe, and after approval thereof may appoint three disinterested freeholders to examine such property as is to be taken by or damaged by the acts of said commissioners under this resolution, including all damages for any land or water right, title, privilege, easement, franchise, or other property which may be required, taken, or impaired for the purposes of this resolution; and said committee, being duly sworn to a faithful discharge of its duties, shall estimate the amount of compensation which said owners or parties affected shall receive, and report the same in writing to such court. Such court may thereupon confirm the doings of said appraisers and direct whether said board of water commissioners shall pay the amounts so reported, in such manner as such court may prescribe, in full compensation for the property acquired or the injury done by the acts of said board; and on compliance with the order of such court said board may proceed with

grant with a further authority to construct a compensating reservoir on the East Branch for the purpose of restoring the flow of the Farmington River to its former assumed efficiency.

The respondents' lands are sought to be taken for the compensating reservoir on the East Branch, from which no water is diverted to the city of Hartford, and the main question in the case is whether the storage of water to be returned to the Farmington River, for the purpose of compensating for the diversion authorized by § 1 of the Resolution, is a public use.

The demurrers present this question in various forms, which may be summarized as follows: that the water is not for the use of the city of Hartford; that the petitioner is not required, but merely authorized, to return the water to the river; that the maintenance of the flow of the river is not a public use, but a private benefit to lower riparian owners; that the real purpose of the East Branch reservoir is to enable the city to trade off the impounded water in lieu of paying money damages for the diversion authorized by § 1; that such purpose is uncertain of accomplishment because the lower riparian owners will be legally entitled to take their compensation in money; and that the Resolution, in so far as it purports to authorize the taking of respondents' lands for the purposes of § 4, is in violation of the constitutions of Connecticut and of the United States.

the construction of its dams, reservoirs, and other works provided for by this resolution, without any liability upon any further claim for compensation for damages, and said board shall thereupon have authority to change said highways overflowed or to be overflowed by reason of the dams erected or to be erected under the authority of this resolution, and to lay out and construct a new highway or highways or to alter old highways, in the places and manner described in the plans hereinbefore provided for; but no highway so proposed to be changed shall be in any way discontinued or obstructed, nor shall public travel thereon be interfered with, until a new highway in lieu thereof has been constructed in accordance with the provisions of this resolution.

Aside from the constitutional question, it was also objected that the petitions were insufficient in point of form, and that the Resolution did not purport to give the petitioner any right of eminent domain except for the purposes specified in § 1. The defect of form relied upon is that the petitions do not pray for determination of the compensation of the respondents by an order of court, but in each case pray for the appointment of appraisers to estimate and report to the court the amount of compensation which the respondents shall receive for their lands.

We think these petitions are in conformity with the language of § 8, which provides for the appointment of such appraisers to estimate the amount of compensation which the owners or parties affected shall receive, and report the same to the court. After that is done, the court may thereupon confirm the doings of the appraisers. But it nowhere appears that the court is to determine the amount of compensation otherwise than by an order confirming the doings of the appraisers. The petitions are sufficient in form.

The point, made in course of the argument, that the Resolution does not purport to grant any right of eminent domain except for the purposes specified in § 1, does not seem to be well taken. The formal grant of power to take is found in § 1, and, after authorizing the taking of lands, etc., necessary or convenient for the works authorized by that section, adds the following: "and which may be necessary or convenient for the purposes of carrying out the provisions of this resolution." This language, on its face, includes § 4, which is one of the provisions of this Resolution. Then § 8 provides that if the petitioner cannot agree upon the amount to be paid "for any land or other property to be taken for such reservoirs," it may refer its petition to the Superior Court, etc., and this language also, on its face,

includes the reservoir specified in § 4 as well as those specified in § 1. Admitting that the grant of eminent domain must be clear and specific, we think this Resolution clearly and specifically grants the right to take land for the East Branch reservoir as well as for the Nepaug River and Phelps Brook reservoirs.

Some of the objections raised by the demurrers are in a way preliminary to the main issue above outlined, although they relate to the question of public use. One of these objections is that the language of § 4 does not require, but merely authorizes, the return of water to Farmington River in lieu of water elsewhere diverted for the use of the city; and the argument is that, so far as this reservoir is concerned, the petitioner may use it for any other and private use, or may cease to use it for the purpose specified. This argument loses sight of the inherent limitations of the powers of municipal corporations, which have only such powers as are expressly granted in their charters, or are necessary to carry into effect the powers so granted. *Dailey* v. *New Haven*, 60 Conn. 314, 319, 22 Atl. 945; *Crofut* v. *Danbury*, 65 Conn. 294, 300, 32 Atl. 365; *Central Railway & Electric Co.'s Appeal*, 67 Conn. 197, 214, 35 Atl. 32; *Fair Haven & W. R. Co.* v. *New Haven*, 77 Conn. 494, 497, 59 Atl. 737. The grant of a specific authority to use this water for the purpose of returning to Farmington River water in lieu of water elsewhere diverted therefrom, is in itself a limited authority which excludes the right to use such water for any other purpose not necessary or incidental to the purpose specified. As to the absence of any obligation or requirement that the water of this East Branch reservoir shall be used for the purpose specified, this Resolution is in the usual form for granting such a franchise as this. It authorizes, but does not require, the petitioner to build and maintain the reservoirs. The obligation to do so grows

out of the acceptance and exercise of the franchise, and out of the taking of the land for the purposes specified in the Resolution. "It is true that the charter is permissive in its terms, and probably no obligation rests upon the corporation to construct the railroad; the option to exercise the right of eminent domain and other public rights is granted. And when that option has been made, and the corporation has located and constructed its line of track, exercising the power of the State in taking property of others, and in so locating and constructing its road, has invited and obtained subscriptions upon the implied promise to construct and operate its road, has commenced to operate the road under the granted powers, thereby inducing the public to rely, in their personal and business relations, upon that state of affairs; by so accepting and acting upon the chartered powers a contract exists to carry into full effect the objects of the charter, and the capital stock, franchises and property of the corporation stand charged primarily with this trust." *Gates* v. *Boston & N. Y. Air Line R. Co.*, 53 Conn. 333, 342, 5 Atl. 695. And so in *New York, N. H. & H. R. Co.* v. *Bridgeport Traction Co.*, 65 Conn. 410, 423, 32 Atl. 953, this court said: "But the plaintiff holds its right of way charged with the performance of a public trust for its continuous use for public accommodation." It is true that in the case of municipal corporations this court has declined to extend the doctrine of implied contract with the State so far as to embrace a strictly governmental duty, for the reason that it preferred not to infringe upon the principle of governmental immunity. *Hewison* v. *New Haven*, 37 Conn. 475. On the other hand, if the grant is of a special power or privilege out of which public duties grow, as in the case of a grant to the common council of New Haven to make by-laws, etc., for the protection and preservation of trees, and the city,

acting under that grant, assumes the care of the trees, it is then liable for any negligence in carrying out the duty thus assumed. *Jones* v. *New Haven*, 34 Conn. 1. But we need not pursue this distinction further, because the doctrine of governmental immunity for municipal acts does not mean that the municipality is under no obligation to perform its governmental duties; it simply means that it is not liable for a resulting injury. It makes no difference, therefore, whether the petitioner would or would not be in the performance of a governmental duty in restoring water to the Farmington River in lieu of water diverted for city purposes, because, in either case, it is and will be obligated, by its acceptance of this amendment to its charter, to restore the water to the river as therein authorized.

Some emphasis was laid in argument on the fact that § 4 authorizes the petitioner to make such "conveyances as may be necessary or convenient to provide for the ownership, maintenance, care, and control of said reservoir on said East Branch of the Farmington river; and all contracts heretofore made by said board of water commissioners in connection therewith are hereby ratified and confirmed." It need hardly be said that no assignee can acquire, by contract or conveyance from the petitioner, any larger right or better title than the petitioner itself possesses. Any such assignee will necessarily assume all the obligations of the petitioner in respect of the continued maintenance and control of said reservoir, and will be under the same restrictions as to the uses which it can lawfully make of the water therein stored.

Another objection made by the demurrers, which should be met before dealing with the main question, is that the real purpose of the East Branch reservoir is not so much to restore the flow of the river to its

former efficiency as to enable the petitioner to trade off the impounded water for the purpose of escaping the payment of money damages to the lower riparian owners. We think this objection is unfounded in fact. In ascertaining the purpose of §4, we must take the Resolution as it reads. Its stated purpose is to restore the flow of the river, and the authority given in § 4 to make contracts providing that the water returned to the river from the East Branch reservoir shall be accepted in diminution of the damages caused by diverting other water from the Nepaug River and Phelps Brook, is on its face merely incidental to such purpose. The Resolution assumes that the flow will be measurably restored; that the actual damages caused by diversion of the other water will thereby be diminished; and very properly authorizes the petitioner to take the benefit of any concession which such owners may be willing to make, in view of the restored efficiency of the flow. It has never been a valid objection to the exercise of the right of eminent domain by a public service corporation that a profit or saving may ultimately be realized in consequence of such taking; and the fact that this petitioner is authorized to make a saving, or even a profit, out of the water returned to the Farmington River, is entirely irrelevant to the underlying question, whether the storage of water for the purpose of maintaining or restoring the flow of the river is for a public use. *West Hartford* v. *Water Commissioners*, 44 Conn. 360.

Having disposed of the other questions raised by the demurrers, we take up now the principal question, whether the maintenance and regulation of the flow of the Farmington River is or is not a public use, either in itself, or in connection with and by way of compensation for the diversion of a part of the river to another watershed, for the use of the city of Hartford. The

question is presented on the petition and demurrer, so that we are required to pass upon it without the aid of any finding as to the purposes for which the flow of the river below these reservoirs is actually used. But we take judicial notice of the fact that the Farmington River is a watercourse of considerable importance; that below these reservoirs, and before it empties into the Connecticut River at Windsor, it flows through Collinsville, Unionville, Farmington, Tariffville, and Poquonnock; that these are populous manufacturing towns and villages, built up around its water-powers; that the river in its course to the Connecticut is capable of being used in other ways for industrial, commercial, sanitary, and municipal purposes; and that its floods and droughts must necessarily affect, directly or indirectly, very many persons other than the riparian owners along its banks.

In this State it is settled that public use means "public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the State under its right of eminent domain for purposes of great advantage to the community, is a taking for public use." *Olmstead* v. *Camp*, 33 Conn. 532, 546; *Todd* v. *Austin*, 34 Conn. 78. These were cases arising under our Flowage Acts and involved a ruling that the development of local water-powers for private industrial enterprises (including grist-mills, a mill for manufacturing axe handles, and a mill for the manufacture of tinware) was of sufficient public utility to justify the taking of private property as for a public use.

This doctrine, although generally received, has been regarded in some quarters as carrying the doctrine of public use to an extreme, and in Massachusetts, as well as in the Supreme Court of the United States, these Acts have been justified as a mode of regulating the

use of water-power in running streams, which without some such regulation could not be beneficially used. And a distinction, not very important for the purposes of this case, is drawn between the right to take private property for a use strictly public, and the right to take it for the purpose of developing water-power. *Fiske* v. *Framingham Mfg. Co.*, 29 Mass. (12 Pick.) 68; *Bates* v. *Weymouth Iron Co.*, 62 Mass. (8 Cush.) 546; *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9, 5 Sup. Ct. Rep. 441. In the latter case, the New Hampshire Flowage Act was upheld as a constitutional exercise of legislative power in favor of a cotton-mill, and not in violation of the Fourteenth Amendment of the Constitution of the United States. But in this State our Flowage Acts have been put squarely on the ground of public use. In *Olmstead* v. *Camp*, 33 Conn. 532, 550, this court said: "If there were any doubt on the subject on first principles, we understand it to be the settled law of the country that the flowing of land for the purposes of mills and manufactories, in view of its effect upon the community, is to be considered as a taking it for public use. It would be difficult to conceive a greater public benefit than garnering up the waste waters of innumerable streams and rivers and ponds and lakes, and compelling them with a gigantic energy to turn machinery and drive mills, and thereby build up cities and villages, and extend the business, the wealth, the population and the prosperity of the State. It is obvious that those sections of the country which afford the greatest facilities for the business of manufacturing and the mechanic arts, must become the workshops and warehouses of other vast regions not possessing these advantages. . . . It is of incalculable importance to this State to keep pace with others in the progress of improvements, and to render to its citizens the fullest opportunity for success in an industrial competition."

This is the right and sufficient basis of our Flowage Acts. The conservation and development of our natural water-powers is as much a matter of public utility in Connecticut as is the irrigation of arid lands in Utah (*Clark* v. *Nash*, 198 U. S. 361, 25 Sup. Ct. Rep. 676), and it lies within the constitutional power of the General Assembly to declare, whether by general Flowage Acts or by special charter, under what circumstances the right of eminent domain may be employed to that end. The Farmington River is largely used for water-power below these reservoirs, and constitutes one of the natural water-powers of the State; and the legislature has declared its conservation to be of sufficient public advantage to justify the taking of private property for the purpose of maintaining and regulating its flow. That being so, the construction and maintenance of the reservoir authorized by § 4 of this Resolution is a public use within the definition heretofore given to that term by this court in connection with our Flowage Acts.

We cannot, however, assume that the General Assembly, in creating this charter, was concerned exclusively with the conservation of water-power as such. It may be that municipal lighting-plants are operated thereby, or that the water is needed for public baths and parks, or that the river is used for municipal drainage, so that any considerable impairment of its flow in times of low water would injure the public or create, or tend to create, a nuisance and a menace to the public health. It is manifestly impossible for this court, upon demurrer, to know what the facts were from which the General Assembly concluded that the construction of this East Branch storage reservoir was of sufficient advantage to the community to warrant the taking of private property.

We are asked, without such knowledge, to declare

the Resolution unconstitutional in part. If there was an evident and entire lack of any possible public advantage or utility, or if, as in *Farist Steel Co. v. Bridgeport,* 60 Conn. 278, 291, 22 Atl. 561, the proceedings showed on their face that the taking, though ostensibly for a public use, was in fact for a purely private purpose, it would be our duty to do so. But the regulation and maintenance of the flow of Farmington River in times of low water is manifestly a public advantage, and for the common benefit of that section of the State.

We, therefore, hold that the purpose of § 4 of the Resolution of the General Assembly approved August 2d, 1911, on which the petition is founded, is one which falls within the general description of a public use, as that term has been defined in this State; and that it is within the constitutional power of the legislature, through any appropriate agency, to take private property for that purpose in the manner contemplated by this petition.

It is claimed that the regulation of the flow of Farmington River is outside the scope of the petitioner's chartered powers. But the petitioner is not undertaking to regulate the flow of Farmington River except as part of a plan for improving the water-supply of the city of Hartford. The General Assembly has given the petitioner authority to build and maintain this East Branch reservoir in connection with the Nepaug River and Phelps Brook reservoirs by a Resolution which is entitled "Increasing the Powers of the Board of Water Commissioners of the City of Hartford"; and the petitioner alleges that it intends to build all these reservoirs, and to exercise all the powers and authorities conferred upon it in said Resolution. This Resolution is in effect an amendment of the charter of the city of Hartford, so that the objection of *ultra vires* cannot avail, unless it is assumed that there are some limita-

tions upon the authority of municipal corporations which the legislature itself cannot enlarge, and that the construction and maintenance of this East Branch reservoir lies outside of such limitations. In other words, the proposition of fact must be that the maintenance and regulation of the flow of the Farmington River by means of this dam and reservoir is unrelated to any legitimate governmental function of the city of Hartford.

We think this last proposition is unsound. We must recognize that the problem of securing sufficient and suitable water-supplies for our larger cities is an increasingly difficult one; that in reaching out beyond its immediate watershed a city encounters the opposition of localities seeking to retain their own watercourses for their own benefit; that our New England streams no longer possess their former constancy of flow; and that the greatest demand on a municipal water-supply comes at the very time when the natural flow of the stream is likely to be lowest. A separate storage reservoir, to impound freshet water and return it to the stream in times of low water, may therefore be a logical and consistent engineering factor in a plan for improving a municipal water-supply, as well as an instrumentality for conserving the flow of the stream. In the judgment of the General Assembly such a compensating reservoir is properly a part of the present plan for improving the water-supply of Hartford; and its judgment on that subject, if not controlling, is at least entitled to be received with very great respect by the courts.

There is error, the judgments are reversed, and the causes remanded to the *Hon. William S. Case,* a judge of the Superior Court, to be proceeded with according to law.

In this opinion the other judges concurred.