DOUGLAS P. HALL, CONSERVATOR (ESTATE OF JULIE P. REVSON) *v.* TOWN OF WESTON

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued May 7—decision released July 30, 1974

*L. Paul Sullivan,* for the appellant (plaintiff).

*Robert M. Wechsler,* with whom was *Bernard Glazer,* for the appellee (defendant).

SHAPIRO, J. The plaintiff, conservator of the estate of Julie Phelps Revson, brought this action against the town of Weston seeking damages and an injunction in order to restrain it from proceeding with the acquisition of certain of the Revson land intended to be used by the defendant town for school purposes. From a judgment rendered denying the prayer for relief, the plaintiff has appealed to this court.

The plaintiff assigns error in the court's refusal to find sixty-six paragraphs of his draft finding which he claims are admitted or undisputed, in the finding by the court of twenty-three paragraphs in

its finding which he claims are found without evidence or are of doubtful meaning, and in the failure by the court to reach the conclusions contained in the seventy-one paragraphs of the plaintiff's draft finding. Since these claims of error have not been briefed or argued, they are treated as abandoned. *Multiplastics, Inc.* v. *Arch Industries, Inc.,* 166 Conn. 280, 282 n., 348 A.2d 618; *Mahon* v. *Heim,* 165 Conn. 251, 252, 332 A.2d 69; Maltbie, Conn. App. Proc. § 327. The plaintiff's remaining claims of error relate to the court's determination regarding the burden of proof as to the necessity of the taking by the defendant of the Revson property and to various claims regarding the rendering of the judgment by the court.

The salient facts found by the court follow, and while seemingly lengthy in our recitation of them, we consider this to be necessary for a proper discussion of the issues involved in this appeal: The defendant filed a "notice of taking" and a "statement of compensation" pursuant to General Statutes §§ 48-6, 48-12 and 8-129,[1] which notice and

---

[1] "[General Statutes] Sec. 48-6. WHEN MUNICIPAL CORPORATIONS MAY TAKE LAND. Any municipal corporation having the right to purchase real estate for its municipal purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power to take or acquire such real estate, within the corporate limits of such municipal corporation, and if, such municipal corporation cannot agree with any owner upon the amount to be paid for any real estate thus taken, it shall proceed in the manner provided by section 48-12 within six months after such vote or such vote shall be void.

"[General Statutes] Sec. 48-12. PROCEDURE FOR CONDEMNING LAND. The procedure for condemning land or other property for any of the purposes specified in sections 48-3, 48-6, 48-8 and 48-9, if those desiring to take such property cannot agree with the owner upon the amount to be paid him for any property thus taken, shall be as follows: The comptroller in the name of the state, any town, municipal corporation or school district, or the trustees or directors of any

statement are dated September 18, 1970, as the first steps in taking by eminent domain 10.5 acres of the Revson property. The defendant deposited with the clerk of the Superior Court the amount set forth in the "statement of compensation." Thereafter the plaintiff instituted this action. The 10.5 acres, part of 30.25 acres owned by Julie Phelps Revson, lie immediately north of the present middle school building, and condemnation of this land was sought for the dual purpose of providing playfields and subsurface septic facilities for an 800-pupil addition to that school. The acquisition of this land was recommended by the Weston board of education. This acreage is on the west side of the Revson property and comes within eighty feet of the westerly corner of the dwelling. Located on the 30.25 acres are a house with outbuildings, a swimming pool, a

---

state institution in the name of the state, shall proceed in the same manner specified for redevelopment agencies in accordance with sections 8-128, 8-129, 8-129a, 8-130, 8-131, 8-132, 8-132a and 8-133.

"[General Statutes] Sec. 8-129. AGENCY TO DETERMINE COMPENSATION AND FILE WITH SUPERIOR COURT AND TOWN CLERKS; NOTICE TO OWNERS AND INTERESTED PARTIES. POSSESSION OF LAND. CERTIFICATE OF TAKING. The redevelopment agency shall determine the compensation to be paid to the persons entitled thereto for such real property and shall file a statement of compensation, containing a description of the property to be taken and the names of all persons having a record interest therein and setting forth the amount of such compensation, and a deposit as provided in section 8-130, with the clerk of the superior court for the county in which the property affected is located. Upon filing such statement of compensation and deposit, the redevelopment agency shall forthwith cause to be recorded, in the office of the town clerk of each town in which the property is located, a copy of such statement of compensation, such recording to have the same effect as and to be treated the same as the recording of a lis pendens, and shall forthwith give notice, as hereinafter provided, to each person appearing of record as an owner of property affected thereby and to each person appearing of record as a holder of any mortgage, lien, assessment or other encumbrance on such property or interest therein . . . ."

tennis court, a dressing room or a bath. The court together with counsel viewed the premises and surrounding area.

In 1965 the Weston board of education adopted a grade organization known as 4-4-4, whereby kindergarten through the fourth grade are housed and administered in one complex known as the elementary school; grades five through eight are housed and administered in the middle school; grades nine through twelve are housed and administered in the high school. This grade grouping was adopted after recommendation by the superintendent of schools, studies and review by the board of education, and was decided upon as being the best and most desirable organization of Weston's school system. The existing middle school building as well as the other school buildings are located on a ninety-acre tract of town-owned land which is immediately adjacent to the condemned Revson property. Also located on this ninety-acre tract are other buildings including the town hall, the fire house, the town library, the school garage, the town dog pound, and the town highway department with buildings for garaging and storing heavy-duty highway equipment as well as nearby land used for storing piles of sand and salt.

The elementary school complex has a capacity of 950 pupils. The high school has a capacity of 750 pupils and, as of October 1, 1970, had 685 pupils. A third wing to the high school has been planned for 1974–1975. The existing middle school was built in 1960, has a capacity of 375–400 pupils, and, because of its limited space, houses only grades seven and eight, comprising 384 pupils. Grade six, comprising 191 pupils, is located in temporary class-

rooms some distance from the middle school, while grade five is located in the elementary school complex. Thus, the present enrollment in the elementary school complex is 1048, thereby causing an excess in its capacity limit of 950. After completion of the addition to the middle school, its capacity will be 1200 pupils and this will allow some room for expected growth. In 1968, the total pupil capacity for the three schools was 2000 and in that year there were 2079 pupils. Enrollment projections for the town were made in 1969 and such projections were reviewed by the state board of education and found to be reasonable. In the past, by actual experience, such enrollment projections have been proved accurate. Historically, the greatest growth in the Weston school system is in the middle and high schools. After reviewing various matters in connection with its projections, the state board of education was of the opinion that its projections were conservative.

The state board of education recommends twenty-seven usable acres for a middle school capacity of 1200 pupils. The addition to the school building will be on the town-owned land connected to the present school. The town explored many sites, including town-owned and other property, in an effort to find a location for the playfields required by the educational program for the expanded middle school. This review covered a period of two years. Physical education is an important part of the curriculum of the middle school as it is in all other schools. The playfields for girls in the middle school will be located on present town-owned property which is adequate. The boys' playfields will consist of two baseball fields of approximately three-and-one-half acres each for use in the spring, and superimposed thereon will be a soccer field and football field for

use in the fall. There is no suitable land on the town-owned property for the boys' playfields needed for the middle school addition. The town owns approximately six acres of land lying to the west of the middle school and adjoining a service road, which tract is irregular in shape and very steep. To obtain one baseball field in that area would require construction of a 600-foot retaining wall which would be excessive in cost. If sloping were used instead of a retaining wall, a shoulder on ninety feet would be required to support the service road thereby leaving insufficient area for one baseball field. In addition, this area is presently the site of the subsurface septic leaching field for the existing middle school and the leaching field would have to be relocated and rebuilt. Four-and-one-half acres of this land are swampy with a peat bog and very wet. To construct a baseball field thereon would require drainage, clearing, excavation of the peat and refilling to a height above the water table for which the estimated cost was $200,000. Other areas in the town-owned complex are at too great a distance to be suitable for playfields for the middle school. The 10.5-acre Revson site is suitable for providing the area necessary for the boys' playfields for use with the expanded middle school.

Adequate subsurface facilities must also be provided for the 800-pupil addition to the middle school. The town explored many sites both on and off its own property in an effort to find a location for such subsurface septic facilities. The state department of health will approve subsurface septic facilities in this area for only an additional 600 pupils and this does not take into account a 100 percent reserve area requirement by this department, effective January 14, 1970, which now must be met by the town.

Various areas near the middle and high schools cannot comply with requirements of the state health code for subsurface septic facilities. The area where the temporary classrooms are located shows evidence of capacity for such facilities but its distance from the middle school renders its use too costly for this purpose. There is no suitable land on the town-owned property for the subsurface septic facilities required for the 800-pupil addition. After soil percolation tests of the Revson property, the state department of health approved that site for the subsurface septic facilities. These facilities will consist of two subsurface leaching fields and connecting facilities as well as a reserve area for each field which is necessary in case of a breakdown of the main system.

The town made an extensive and exhaustive reevaluation of its educational program and system and only after exploring all alternative sites, considering the requirements of its educational program, was action taken by vote to acquire the Revson land as a solution to the town's immediate educational needs. This review, over a period of two years, included grade groupings, sites off and on the town property and various building combinations, assistance by architects and engineers who designed the proposed middle school addition and who previously designed the high school, and a review of town-owned property and surrounding privately-owned properties. From this review the Revson site was determined to be the most suitable for both playfields and subsurface septic fields. Other private properties reviewed by the town were found unsuitable because they were too wet or swampy, contained springs or were too distant to be feasible. Charles J. Owen, Jr., the town's con-

sulting engineer, who had been involved in services related to seventy-five schools and colleges, and is the soils engineer for the architectural firm designing the middle school addition, recommended that the Revson property would be needed to provide the necessary area for the septic fields and the boys' playfields. Owen worked on the design and location of the high school which was completed in 1968. He is familiar with the entire town property complex on which the schools are located and has spent considerable time in all seasons of the year during the past five years on the town properties in his work as engineer on town projects. He studied the areas between the middle school and the highway department which are upland swamps with a peat bog and the area east and south of the high school and determined that they were unsuitable for subsurface septic facilities. The opinion of the chief of the bureau of school buildings of the state board of education was that acquisition of the Revson land was essential to the school expansion to a 1200 pupil capacity. Thereafter, on June 1, 1970, the town board of education resolved to acquire the Revson property. The plaintiff made no tests and has failed to demonstrate the suitability of any other property for subsurface septic facilities for the proposed middle school.

On June 29, 1970, by referendum, the town appropriated $305,000 for architects' fees for preparation of final plans and specifications and bid documents for the 800-pupil addition to the middle school. This referendum was preceded by a town meeting on June 19, 1970, at which time the proposed condemnation was discussed. For a year or more prior to the town meeting the need and planning for the school were discussed by the town board of education at

numerous meetings with the townspeople. The town board of education, the board of finance and the board of selectmen recommended and approved the acquisition of the Revson site for school purposes and recommended and approved the appropriation of $235,000 for its acquisition and the costs and expenses thereof.[4] After the referendum vote on June 29, 1970, the town attempted to agree with the plaintiff on a sales price for the land but these efforts failed. The final plans and specifications for the construction of the addition to the middle school went out to bid on December 2, 1970. As of the date of the conclusion of the trial, December 15, 1970, no referendum was yet held by the town for the appropriation of funds for the construction of the school addition. The total cost of the 800-pupil addition including the cost of acquiring the Revson site is estimated at a little over $6,000,000. The town's bonding capacity based on tax receipts as of June 30, 1969, is $7,329,464.32.

---

[4] Article 2 of the town charter of the town of Weston specifies in part as follows: "Section 2.1 . . . The legislative powers of the Town, to the extent specified in this article, shall be vested in the Town meeting. . . . Section 2.4 . . . A Town Meeting shall be required for the approval of any of the following: . . . (b) after recommendations by the Board of Selectmen and approval by the Board of Finance: (1) an appropriation or an authorization for the issuance of bonds, notes, or other borrowing in excess of the amounts provided for in Section 8.5 of this Charter, but less than $100,000; . . . Section 2.5 Appropriations or Other Action Requiring Referendum A referendum shall be required in the following instances; (a) . . . any appropriation or any authorization for the issuance of bonds, notes or other borrowing of $100,000 or more, after it has been recommended by the Board of Selectmen and approved by the Board of Finance, or any extraordinary appropriation as provided in Section 8.6 in this Charter shall be subject to referendum . . . ." Sections 2.4, 2.5, 8.5 and 8.6 of the charter provide that the extraordinary appropriations for any agency exceeding $2000 must be voted upon by a town meeting (if less than $100,000) and by referendum if they exceed $100,000.

On the facts as found, the court concluded that the defendant complied with General Statutes §§ 48-6, 48-12, 8-128[5] and 8-129; that the condemnation proceeding was begun in accordance with § 48-12 by the filing of a statement of compensation, lis pendens and service of a notice of taking within six months of a referendum vote as required by § 48-6; that the burden of proof that the decision of the town to condemn the Revson property was arbitrary, unreasonable, in bad faith or in abuse of its power or discretion is upon the plaintiff and the determination of the necessity for such taking is subject to review only for the same reasons; that necessity means only reasonable necessity and there is no requirement that the town plead or prove it; that the town did not act arbitrarily, unreasonably or in bad faith, or abuse the power or discretion conferred upon it, nor did it so act in determining that the Revson property should be condemned for playfields and subsurface septic facilities for the expansion of the middle school as being reasonably necessary for the addition to it; that the town is not required to have a referendum to approve the actual construction of the school or vote the funds therefor prior to the condemnation of the Revson property; and that the plaintiff has failed to sustain the burden of proving unreasonableness, abuse of power, discretion or bad faith in the actions of the town and has failed to demonstrate the suitability of any other land for subsurface septic facilities for the proposed school. -

[5] "[General Statutes] Sec. 8-128. ACQUISITION OR RENTAL OF REAL PROPERTY IN A REDEVELOPMENT AREA. . . . The redevelopment agency may acquire real property by eminent domain with the approval of the legislative body of the municipality and in accordance with the provisions of sections 8-129 to 8-133, inclusive, and this section. . . ."

In his appeal the plaintiff assigns as error the conclusions of the trial court. The court's conclusions are tested by the finding. *C & R Connair, Inc.* v. *Hartford,* 166 Conn. 413, 352 A.2d 298; *Hartford Kosher Caterers, Inc.* v. *Gazda,* 165 Conn. 478, 480, 338 A.2d 497. They must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. *Klein* v. *Chatfield,* 166 Conn. 76, 80, 347 A.2d 58.

The plaintiff's claims will be discussed in the order raised in his brief. The first contention made is that the condemnation was speculative in nature in not being based upon a decision to use the property for public use. The main thrust of this claim is that no town meeting and referendum had been held to determine whether the proposed middle school addition would ever be built and that the referendum of June 29, 1970, merely appropriated money to prepare a detailed proposal to build to be later submitted to the electorate.

The court found that the town plan, published in 1969, included the Revson property as a possible site and this plan proposed that part or all of the Revson property be acquired for middle school purposes to implement the 4-4-4 grade division system. The referendum vote of June 29, 1970, appropriated a sum for architects' fees for preparation of final plans, specifications and bid documents for the middle school addition on this site. After this referendum vote the town attempted to agree with the plaintiff on a sales price for the 10.5 acres of the Revson land, but without success. Thereafter, the condemnation proceeding was begun in accordance with § 48-12 by filing a statement of compensation, lis pendens and service of a notice of taking within

six months of the referendum vote as required by § 48-6. The plaintiff argues in his brief and before this court that the town should have waited with regard to these condemnation proceedings, that is, held up finalizing its plans and specifications and not have expended money for architects' fees until it had decided on the construction of the school, and that, therefore, the condemnation proceedings were premature and speculative in nature and could not be construed as intended to utilize the property for a public purpose. The plaintiff cites no authority for this proposition. We view this as an untenable position since it clearly suggests that the first step required is a referendum whereby funds might be appropriated for the actual construction of the school addition, such action to take place prior to the acquisition of the building site.

In *West Hartford* v. *Talcott*, 138 Conn. 82, 82 A.2d 351, in which the town took land fixed upon as a school site, this court held (p. 88):[6] "Plans for the use of the properties sought to be taken for an addition to the school and for a playfield, along the lines stated above, were carefully prepared by the principal and the superintendent of schools, were approved by the board of education and formed the basis of the action of the town council in voting to acquire the property." Thereafter, the West Hartford town council authorized and directed its corporation counsel to institute condemnation proceedings for the purpose of acquiring the defendant's

---

[6] The opinion on pages 85 to 87 had discussed the court's finding regarding the need to acquire for school purposes two pieces of land comprising 8.62 acres as being necessary to expand the school's physical plant so as to permit needed area for proper pupil instruction and physical education. The forecasting of school requirements and the sufficiency of future needs as well as the importance of physical education in the curriculum were recited.

land. In the present case § 48-6 in connection with § 48-12 provides the procedures whereby a municipal corporation may take land by condemnation for municipal purposes. As the finding discloses, care was exercised by the town in determining its school needs in discussions held by the board of education with the townspeople at numerous meetings; in reviewing various properties over a two-year period; in receiving the recommendation of the boards of education, finance and selectmen for the acquisition of the site; in concluding that the Revson property was the most suitable to fill its needs; and in its eventual resorting to condemnation in accordance with the statutory requirements. The conclusions reached by the court that the town has complied with §§ 48-6, 48-12, 8-128 and 8-129 are fully supported by the finding.

The claim that the property cannot be condemned without a prior decision by the town that the land is necessary for a specific and determined public use requires some discussion. First, it must be remembered that §§ 48-6 and 48-12 limit a municipal corporation to taking real estate by condemnation for its municipal purposes. In dealing with a right of condemnation regarding an easement for public use this court held that "it is sufficient to observe that an obligation to devote the easement to the specified public use authorized by the legislature grows out of the acceptance and exercise of the delegated power of eminent domain. *Water Commissioners* v. *Manchester,* 87 Conn. 193, 200, 87 A. 870. . . . Should the plaintiff breach its duty . . . [to use the land for some objective foreign to the purpose for which it was taken], there is ample judicial machinery available to the defendants to rectify the wrong. A claim of the nature under dis-

cussion can be made in almost every condemnation case. It amounts to nothing more than legal bugaboo. By exercising the power of eminent domain granted by the act, the plaintiff becomes bound to devote the property acquired to the purpose for which the legislature has authorized the taking . . . ." *Northeastern Gas Transmission Co.* v. *Collins,* 138 Conn. 582, 588–89, 87 A.2d 139. Thus, it can be seen that the town of Weston, in exercising its power of eminent domain is bound to devote the condemned property to the public use for which it was thus acquired. The claim is without merit.

The plaintiff makes the claim that the court was in error in requiring him to go forward with the evidence and assume the burden of proof as to the necessity of the taking. The plaintiff relies upon *State* v. *Simmons,* 153 Conn. 351, 216 A.2d 632, as authority for this contention. A careful reading of that case will disclose that such a reliance is unwarranted. The plaintiff alleged in his complaint that the town "has failed and neglected to comply with the General Statutes prescribing the procedure for taking land by eminent domain." The defendant in its answer denies this allegation. This left the burden of proof with the plaintiff as to his affirmative allegation. As already pointed out, the town proceeded under statutory authority to condemn the plaintiff's land. The burden of attacking that authority rested upon the plaintiff. See *State* v. *Simmons,* supra, 353; *State* v. *Fahey,* 147 Conn. 13, 18, 156 A.2d 463; *Bridgeport Hydraulic Co.* v. *Rempsen,* 124 Conn. 437, 442, 200 A. 348; *Water Commissioners* v. *Johnson,* 86 Conn. 151, 160, 84 A. 727.

The plaintiff makes the claim that the town ignored the existence of its own adequate and

unappropriated land adjacent to the existing school. The finding discloses that the town explored many sites both on and off town property; that the land comprising the six acres west of the middle school was too steep and excessive in cost so as to be used as a baseball field; that such construction would require the relocation and rebuilding of the septic leaching fields; that the four-and-one-half acres between the highway department area and the middle school are swampy with a peat bog and very wet, and in order to construct a baseball field thereon the cost to drain, clear, excavate and refill the area would be $200,000, an excessive sum; that the area south and west of the middle school was found unsuitable by the state health department; that the area east of the school is a swamp with peat bog overlaying clay or till and is unsuitable for underground septic facilities; that other areas were either unsuitable, too far removed or too costly to develop; and that there is no suitable land on the town-owned property for the subsurface septic facilities required for the school addition. The court further found that the town's consulting engineer recommended the need for the Revson land for the septic fields; that the chief of the bureau of school buildings of the state board of education gave his opinion that the land was essential to the completion of the school; and that Charles J. Owen, Jr., the town's consulting engineer, recommended the use of the Revson land. The plaintiff contends that Owen's recommendation should be disregarded in the light of testimony given by his own expert. "The trier may accept or reject the testimony of an expert offered by one party or the other in whole or in part. *Richard* v. *A. Waldman & Sons, Inc.,* 155 Conn. 343, 348, 232 A.2d 307. It is elementary that

the trier is the final judge of the credibility of the evidence and the weight to be given to it. *Morgan* v. *Hill,* 139 Conn. 159, 161, 90 A.2d 641." *Cecio Bros., Inc.* v. *Feldmann,* 161 Conn. 265, 271, 287 A.2d 374. We find no merit to this claim.

The next claim made by the plaintiff is that the court erred in allowing the town to condemn a greater legal interest in the land, here the fee, where a lesser legal interest, an easement, would satisfy the town's need. The plaintiff argues in his brief "that a condemnor cannot take the fee in the land where an easement would completely satisfy its requirements." As his authority the plaintiff cites *Northeastern Gas Transmission Co.* v. *Collins,* supra. There the court (p. 592) held: "It is within the province of the legislature to determine both the quantity and the quality of the estate which a condemnor may acquire. 3 Nichols, Eminent Domain (3d Ed.) § 9.2 [1]. Thus, authority may be granted to take the fee or an easement. *Driscoll* v. *New Haven,* 75 Conn. 92, 99, 52 A. 618. The legislature may likewise authorize the taking of an interest which is either permanent or temporary. *Waterbury* v. *Platt Bros. & Co.,* 75 Conn. 387, 392, 53 A. 958." In *Collins* the plaintiff sought to obtain a right of way fifty feet in width to cross the defendant's land of which the inner thirty feet were sought for a permanent easement within which to lay the gas pipe while the outer ten feet on each side temporarily were needed solely for the purpose of providing ample space for the movement of heavy equipment used in the installation of the pipe.

In the present case, the court found that the playfields and subsurface septic facilities are planned

to be constructed at the most feasible locations for these facilities and that to locate some of the facilities in other areas would be too costly. Further, the taking line and site of the area condemned conforms with that recommended by the town's consulting engineer. The court concluded that the 10.5 acres of the Revson property are reasonably necessary to provide playfields and subsurface septic facilities for the expanded middle school. Thus, because of the nature of the use of the Revson land for the school purposes which we have enumerated, the plaintiff's reliance upon the case of *Northeastern Gas Transmission Co.* v. *Collins,* supra, does not aid him. Here, the town acted under statutory authority of eminent domain in taking land for municipal purposes. The nature of the use was clearly an essential part of the school program. As already stated, the plaintiff had the burden of establishing that the taking by the town was unreasonable, in bad faith or an abuse of power. This he failed to do.

Finally, the plaintiff assigns error in the claim that the court failed to require that the location of the taking be such so, as to minimize the detrimental effect which the taking would have on the remaining Revson property. In his complaint, the plaintiff alleged that the 10.5 acres are an integral part of the Revson estate and its condemnation will sever approximately one-third of the land of the estate, the effect of which will be drastically to destroy its characteristics. In his brief, the plaintiff refers to this as "severance damage" and argues that the taking can be restrained if it is excessive and that the amount of land to be taken must be reasonable and not arbitrary. Based on the facts before it, the court concluded that the town, in con-

demning the 10.5 acres, did not act arbitrarily or unreasonably and the property was necessary for the middle school addition. From the facts as found by the court, we cannot say that its conclusions are not legally or logically consistent with those facts. Nor can we say that they involve the application of some erroneous rule of law material to the case.

There is no error.

In this opinion the other judges concurred.